on behalf of the Avalon, Ms. Emily S. Wood, on behalf of the people, Ms. Dianne L. Campbell. Thank you. Ms. Wood, you may proceed. Good morning. May it please the Court. Again, my name is Emily Wood. I'm from the Office of the State Appellate Defender on behalf of Francisco Salazar. In this case, the identity of the shooter is known. While riding in Francisco Salazar's Chevy Tahoe, Zachary Reyes pulled out a semi-automatic weapon and fired 11 times into the car next to them, killing Jason Ventura and injuring Eduardo Gaetan. Jorge Ruiz, who was another passenger in the car, was thankfully unharmed. Now, the shooting was done by Zachary Reyes alone, and the facts demonstrate that Francisco actually had nothing to do with it. Francisco's intent is at the very heart of this case, and it goes to whether his conviction can be upheld under either issue that he has raised on his direct appeal. With respect to the first issue, we know that a defendant can be held accountable for the actions of a principal offender if he either shares the intent of the principal offender or he enters into a common design with that offender. Now, the key is that under either theory of accountability, the state still has to prove that the defendant, either before or during the commission of the offense, and with the intent to promote or facilitate such commission, he actually helps that person do the action. What about the, when you say he actually helps that person do the action, he doesn't have to actually physically help the person, but if he indirectly aids during the commission of the offense, you would agree that that is enough for common design, correct? Absolutely, as long as there's both intent to do so and then some type of. And his knowledge or intent can be inferred from his actions during and after the event, correct? After, yes, the accountability statute clearly states before and during, but yes, I mean, absolutely, we can take a look at that. Well, it's pretty clear from our case law over the last several decades that flight can be, you can infer intent from the defendant's behavior, in particular fleeing and assisting in destroying or getting rid of evidence, correct? Provided that there is knowledge ahead of time of what was going to happen. Knowledge ahead of time can be inferred from the defendant's behaviors during and after the event, correct? It can be, if that is a reasonable inference from the facts that all was played out at trial. Which is the jury's function. Yes, yes, and I'm here to argue that some of the... You're here to argue it's just not enough here. Exactly. The maneuvers of the vehicle, the hand gesture, the gang sign, that in totality looking at all the evidence in light most favorable to the state is not enough to show common design. That's your argument. Absolutely, there's not enough to show common design, and there's not enough to show a shared intent either. Now, it's our position, of course, that this is really a shared intent case when you get down to the nuts and bolts of it. The state would argue otherwise. Shared intent would be a more difficult, difficult maybe issue to prove, wouldn't it, than common design? Yes.  Right. You need to have known, in this particular case, you need to have known that Zachary was armed, and you need to have known and intended to help facilitate the actual shooting of the car next to them. But the problem in this case is that all the witnesses, including the state's own witnesses, agree that there was no crime planned, and that should kick out common design theory, and no prior knowledge of the gun, which again negatively affects any sort of shared intent. Without the knowledge of the gun, that takes care of the shared intent, like I said, and I would cite to people versus Tory Taylor and people versus Dennis with that. Does the crime have to be preplanned? For shared intent, it would. And let me clarify that the planning can be short. I don't take issue with the state's comment that it can be a quick decision to go ahead and commit the shooting. But Francisco has to have known about the gun under shared intent and intended to aid in the facilitation of the shooting. How does that factor into common design? With respect to common design, you have to have planned a criminal offense during the commission of which something else happens for which you are then held accountable. Do we have to point to that criminal offense? Yes. So something that just happens on the spur of the moment, but someone clearly, there's no preplanning involved, but someone clearly aids another person in that offense. That wouldn't apply? Without knowledge and without any sort of planning of any criminal activity, there's no way that the defendant can be held accountable under existing Supreme Court law. Absolutely. I mean, people versus Perez says that just because you are there and you happen to give some sort of information that the shooter is actually able to take advantage of and commit the shooting and the murder, that does not mean that you are accountable for those actions. Here you have, according to the evidence, the defendant maneuvering his vehicle, doing a U-turn, getting behind the impellet, then pulling up next to the impellet and giving, according to Sandoval, and two witnesses testified that he gave a go-ahead signal, a hand gesture. Well, one person, only Eloy Sandoval, said that he interpreted some hand movement by the defendant to be a go-ahead gesture. Which he described as both his hands at his waist and a turn in a direction. Right. Something like this as I'm reading the record. That is directly contradicted, however, by Cesar Corral, who says, no, the defendant only turned down the radio and asked, which way do I go home? Let's go with the idea that we're going to look at the evidence in light most favorable to the state and every inference in favor of the state in that respect. So the jury could believe that a hand gesture was made to go ahead, correct? I mean, there was testimony to that. So the jury could believe the witness and say, yeah, I believe that a hand gesture was made and a hand gesture meant go ahead. Go ahead and do what? We don't know. I mean, again, without knowledge that Zachary was armed, which everyone in the Tahoe, even the state's witnesses, say that they had no prior knowledge of that. They had no prior knowledge that Zachary was armed. After the shooting happened, everyone was shocked and stunned because something, even according to Eloy, said something just happened that we had not planned. And then at that point, everyone kind of freaks out and chaos ensues in the Tahoe. So this is Zachary as a lone young man unbeknownst to anyone in the car. So even if- Chaos, you said chaos ensued in the Tahoe. The defendant pulled out immediately. Right. There was no hesitation. The conversations occurred sometime after that, after they got to a place where they felt that they were safe, correct? Well, immediately after the shooting, there's different people saying, go, go, go. Right. We've got to get out of here. He doesn't stop. He doesn't do anything to determine whether or not that vehicle that just crashed into a tree, there's injured people in there. He just takes off. Right, right, right. And all of that- You're saying that's not enough to infer knowledge, despite what the witnesses say. Your position is that it's not enough for a juror to infer that the defendant had knowledge. No. And for a few key facts. One is that it's uncontradicted that Francisco did not know where they were. He was relying completely on Eloy Sandoval for directions to get in and out. Another uncontroverted piece of evidence is the fact that everyone in the Tahoe, again, including the state's witnesses, all said the only plan they had that night was to go to a party. And they were about to come home. So if we take one step back, even the two U-turns were fully explained by both the defendant and actually supported, corroborated by Eloy, who testified, yes, they pulled away, but they discussed whether they should go back to the party. That explains the first U-turn. Then they ultimately decided, no, there wasn't beer at the party. There were only a couple of girls at the party. They decided it wasn't going to be worth the cover charge. They flipped back around to go home. And the jury had to believe that? I'm sorry? The jury had to believe that. It was completely uncontradicted. But uncontradicted doesn't mean the jury has to believe it. The jury could look at the evidence, listen to the uncontradicted evidence, but also use its own common experience in life and reasonable inferences to be drawn from the evidence and draw an entirely different conclusion. Yes, absolutely. But, of course, it's our argument that because these events were explained, the reasonable inference actually directly flows from the actual evidence. So the jury, it is up to the jury to disregard or to believe what is in front of them. But, again, it's our position that given the evidence that came out at trial, the U-turns were explained. When he gets to the intersection, there's only one person who sees him make a hand gesture. It's that person's conclusion, speculation. He's not really sure. He assumes it's a go-ahead gesture. And perhaps he assumes it's a go-ahead gesture because of what happens next. Could the U-turns have been explained or a reasonable inference for the U-turns for a different reason? That is, the gang disrespect signs that were flashed back and forth on the two different occasions. Sure. And the testimony differs with respect to that, with respect to who said so-and-so was giving gang signs. We know from Cesar he did flash some gang signs and he did give the other car the middle finger. He has admitted to that. We know that possibly Zachary Ray flashed some gang signs. But then there's also testimony that maybe George did not, Zachary did not, Cesar did not. It's very conflicting with respect to that. There's also testimony that the defendant may or may not have been a Latin king, correct? Correct. Correct. And the most important criteria for gang membership he does not meet. There's never been any self-admission. He has no gang tattoos. In fact, the gang contacts that the police show really pertain to clothing and hanging out with friends. But again, it's hanging out. He's in a car with all Latin king-affiliated individuals. Sure. They see individuals who are, again, evidence is Ambrose gang-related individuals. Gang signs are flashed back and forth. He does two U-turns that he ends up right next to the car before these shots are fired. And then this go-ahead signal is given that the jury could believe to be go-ahead to confront the gang members in some way. Separate and apart from knowledge of a gun, a go-ahead, okay, go-ahead and confront these gang members in some fashion. Except that without knowledge of the gun, there can't be any shared intent to commit a shooting. How would you commit a shooting without a gun? If you don't know the gun is there, you cannot share that intent. And so the fallback, of course, which is the state's position, is that, well, then there has to be a common design. Common design of what? We have yet to identify any other planned criminal activity that's going on that night. And indeed, everyone agreed they just wanted to go to a party and then go home. Well, did the, is it conceivable, and could this be what the jury was looking at since we have to take the evidence in the light most favorable, that when Mr. Ventura and his two colleagues walked out of the party, there was discussion about, hey, look at these guys or who are these guys? And right then, with a car full of Latin kings, something began to occur. That would be, I mean, that would be pure speculation. There's absolutely no evidence of that to go on. And again, without knowledge of the gun, it wouldn't be a shared intent that would be formed at that point. It would have to be under common design. And again, we don't have any common plan to commit a criminal activity. Well, there was a criminal activity that was going on. They were smoking dope in the car and driving around with open liquor, so there was some criminal activity. But that's completely separate and apart from any felonies that they were about to commit. Absolutely. And we know from people versus Dennis where they were out to buy drugs in that case, it's not enough. I mean, what we have to have is intent to facilitate the offense. And it has to actually go towards that. We know from other Supreme Court cases, Taylor and Dennis actually, is that helping after the offense, it has to be basically an element of the offense for it to be able to count towards accountability for that. During the offense, he maneuvered the vehicle and gave the go-ahead signal. During the offense. Right. Which, again, we would argue because that, those events, those movements were all otherwise explained, it was not a reasonable inference for the jury to have. The fact that there are a fully occupied, essentially a fully occupied vehicle, isn't it likely a reasonable inference that somebody in that vehicle said something like, what are you doing? Put the gun away or something like that? That's not a reasonable inference? There's no evidence of that? There's absolutely no evidence. And again, you have to be convicted beyond a reasonable doubt. And again, the evidence points, there's a lack of evidence or contrary evidence. And so under these facts of this case, it's just insufficient to support a conviction, either under shared intent or under common design. What about the instructional issue? Sure. The instructional issue, too, again, we're talking about Francisco's intent here. When the jury is instructed towards attempt to murder that they have to find that the defendant intended to kill an individual, we don't know. Because that's broadly worded, we don't know exactly how the jury parsed out the accountability with respect to Francisco. Were they basing the attempt murder convictions based on their idea that there was an intent to kill the driver, Jason Ventura? We don't know. And for that very reason, at least with respect to the two attempt murder cases, we would ask this court to reverse and remand for a new trial based on those. The instruction was proper. It was IPI, correct? It was IPI, absolutely. And the verdict forms had the names of the individuals? Yes. Yes. But when you're told that you have to just have intent to kill an individual, if they have agreed already that there was an intent to kill maybe one person, then the fact that there are names on the actual individual verdict forms doesn't really make a difference at that point. Again, they've already made their decision that Francisco should be on the hook for killing Andy. If they're instructed, for example, to find the defendant guilty of first degree murder of Ruiz, is that what you're saying? Yes. You have to have that? Yes. Even though the verdict forms specifically say Ruiz and Guyton? Right. Right. And there's support for that. The judge's responsibility to clarify this when you're involving more than one victim. And especially given the fact that attempt murder is a specific intent crime, we need to make sure that the jury is adequately prepared to, again, parse out the responsibility that they have put on the defendant. So, okay, seeing there are no other questions, thank you very much. We'd ask this court again to reverse his convictions outright pursuant to argument one. All right. Thank you, counsel. You will have time for rebuttal argument. Ms. Campbell, you may proceed. Good morning, your honors. Again, I'm Diane Campbell with the appellate prosecutors, and I'm going to just briefly address the jury verdict issue. Case law is that you take the instructions as a whole. They were IPI instructions that were given. The verdict forms specified the two different individuals for the attempt murders taken as a whole. The jury was clearly and specifically instructed, and they would not have been misled or confused. We can also look at the closing arguments to determine whether or not there was any confusion, correct? Yes. Would there have been any error if they had been identified in the jury in the actual instruction as opposed to just on the verdict form? I think that would have been more confusing because in this case you have the two different individuals. So if you have the instruction for attempt given without specifying the individual and then you have it specified on the individual jury verdict forms, then if they have hypothetically made up their mind on some other basis, when they go to sign that jury verdict form, they won't do it because the individual is specified on the verdict form. So if you look at the instructions as a whole, you know there was not confusion or misleading. All right, then I will go on to the first issue. Do you agree this is not a specific intent? No. I think I agree with Justice Hutchinson that specific intent is a more difficult burden to prove. I think it was proven. I think at the trial the emphasis was more on common design, and you can tell that in particular by some of the trial judge's post-trial comments. I quote that on page four of my brief, and the judge specifically notes, I believe that satisfies the common design rule under Illinois. So obviously I think the majority of the emphasis was on common design, but I don't think that specific intent was not proven. I want to ask about one witness. It's Mr. Sandoval. His testimony, he's presented by the state. I'm assuming he was identified as being in the car, but he wasn't charged and there was something else. Mr. Sandoval gives testimony that's different than almost everybody else who's called. What's a jury supposed to do with somebody who's in the car who gives directions according to most everybody? Go here, let's get rid of the gun. Go here, let's get rid of the shirt. Oh, by the way, here, take my shirt. You know, what's that about? Well, I think that is about the jury making a credibility assessment. And in this case, both the defendant testified. Some of the other occupants of the auto, Mr. Corral testified. The jury had the opportunity to see the hand gesture demonstrated in court to them. So it is clearly up to them to make the credibility assessment and to assess the conflicting evidence. And the trial judge, who had a similar opportunity, much better than we do just from reviewing the record, agreed with their assessment. In particular, there's also, I think, the positioning of the car. Eloy Sandoval was in the middle of the back seat, so he would have had a better opportunity to see what was going on in the front seat than either of the two companion gentlemen in the back seat. I'd also like to address opposing counsel's argument about intent. In particular, if you look at the Phillips case, which is the 4th District one that I cited as additional authority, that came out after Fernandez. And in that case, the court is looking at specifically some of that. And it quotes another case, which is called Tarver, in that. And in that, they talk about groups of shooting individuals going to confront others. And they talk about possibly the common design of confronting. And they talk about disorderly conduct or disturbing the peace. In this case, assault and battery, that could be the underlying. Okay. When did this confronting begin? Can we set a timeline in this set of facts where the confronting began? Was it when they got in the car to go to the party? Was it when Reyes and Correll come out and say it's not worth their effort? Was it when they saw the three individuals? I would place it as when they're at the party and they see Correll and Reyes had gone into the party. And presumably could have seen the opposing gang individuals in there. Certainly, when they're back with their companions in their car and they see the people from the Impala coming out of the party and identify them as opposing gang members, that can be the place where the confrontation starts to come. Then their car pulls out and passes. There's gang signs flashed back and forth along with a middle finger. They go. They do the first U-turn. When you say they, you're talking about the defendant? This is the SUV with the defendant. The victims were at Impala, so I'll try and refer to the cars that way. So the SUV does its first U-turn. It passes by the Impala again. There's more gang flashing. In fact, the defendant himself points out that the Impala is flashing opposing gang signs. He drives past, does his second U-turn, and by then the Impala is pulling away. They're following a friend of theirs, a C, in a third car, and they're taking off. The SUV with the defendant and Reyes pulls up behind them. The Impala stops at a stoplight. Instead of staying behind the Impala, because the Impala, there's testimony that it was planning to turn left. Instead of staying behind the Impala, which is turning left, it pulls up next to it. That means at this point it must be in the wrong lane. You can certainly view the scenes of the incident, which are People's Exhibit 7A and 7B. There's also photos of the Impala at People's Exhibit 6A to 6T. And then they pull up next to the Impala. There's the go-ahead gesture, which is demonstrated to the jury in the courtroom, and then there's the firing. That is the acts which Mr. Salazar performed to aid the defendant in the shooting. The trial judge refers to it as piloting the vehicle, and I think that's a good description because that shows that he intended to do this action, and he's doing more than acquiescing or just being merely present. He is, in fact, aiding the defendant, putting him into position, giving him the go-ahead gesture to perform the act. There's certainly evidence of aiding. The issue is knowledge and intent. Yes. Was there knowledge of the criminal purpose at that point in time? Well, I think there is when you consider that they're going to confront their rival gang members. I think that's a common, easily inferred fact by the multiple U-turns. If he was just, you know, a lost guy trying to go home, why did he, you know, he was behind the Impala at, well, why do multiple U-turns? Why catch up with the Impala? If you drive a little slower, you can avoid confronting these people. If you don't pull up next to them, you can avoid confronting them. The defendant was actively aiding Reyes in confronting the occupants of the Impala. And your argument is that all of those actions speak of knowledge. It's the totality of the circumstances. An inference of knowledge that somebody is armed with a gun flows from all that evidence. There's no direct testimony that he knew that, well, sorry. When he flashes the go-ahead sign, does that indicate go ahead what, get out of the car? It could mean a multitude of things. There's testimony from, I think it was Sandoval, that Reyes and Salazar arrived together in the truck. So easily, if they had come with the truck, Salazar could know that Reyes had the gun. There's no direct. Isn't Sandoval the only one who testifies to that? Everybody else? Nobody else. They don't remember. But Salazar, he says. But Sandoval is the one who calls Mr. Salazar, isn't it, and says, come on over, we're going to go to a party? Yeah. So isn't it conceivable he's in the truck, too? No one said that. Okay. We do have testimony from him that the two arrived together in the truck. Let's see. There's also, and Justice Burkett, I think, pointed this out, you can also examine the actions after the offense to determine, and this is in part from People v. Johnson, which is cited in my brief at page 9, and the factors that you look to after the incident are, is the defendant present during the crime, his flight from the scene, the defendant's failure to report the incident, and his continued affiliation with his companion. Well, what is he supposed to do, get out of the car? Oh, my gosh, somebody's been shot. I'm going to get out of my car and leave all these people here. He actually had that opportunity on several occasions. After they pull out, well, first of all, you know, he didn't have to set up the situation where Reyes can shoot him by pulling up next to him, you know, after the series of events. But after the incident, he takes off. Instead of staying at the scene, he takes off. Well, isn't it because Sandoval tells him to, says, you know, go, go, go, and he says something else like get the F out of here? Yeah. Well, you could say no. At one point, Mr. or Eloy Sandoval also, when they were trailing to Aurora by the police, he said, you know, ditch the police, and at that point, Mr. Salazar chose to disregard Mr. Eloy's directions. But some of the other factors are they pull into one parking lot and, I believe, back into the spot. Reyes then gets out to dump the gun. At that point, defendant in control of the auto could have pulled off and left Reyes. They then pull out and they go to a second location where, again, Reyes gets out of the car to dump the hoodie. Again, he could have pulled out but didn't. When they're coming out of the second location, they are passed by a police car. He makes no attempt to report the incident by signaling the police. They pull out. The police car does a U-turn and starts to follow them again. He doesn't try and signal them that, you know, hey, I've got this shooter guy, come help me. But isn't his testimony that he was afraid reasonable? Well, there's also testimony, and opposing counsel points this out on page 4 of her brief, that he frequently saw Eloy. So, you know, if he knows about him and he's afraid, it doesn't inhibit him from having frequent contact with him. That also goes towards, you know, the gang membership, which is an element here. You know, if he's frequently with Eloy, then he wouldn't qualify as, you know, a gang member. He never self-admitted that he was, but he meets the criteria. Something that's not raised in the brief. Was there an add-on that was supposed to be to the murder? Was there a firearm add-on, even though it's only not for Eloy? Not for our defendant because the add-on comes if you personally fired. Only if you personally fired. Correct. So certainly Mr. Reyes would be eligible, but not the defendant in this case. There's never been any accusation that he shot the defendant personally with a firearm. Again, what you have to emphasize here is that the sort of common design was to confront their rival gang members. In order to do this, the defendant performed two U-turns, then followed the impala, and when it stopped at a light, pulled into the opposing lane of traffic in order to pull up next to him, made the go-ahead gesture, which was demonstrated to the jury. Those are the acts that were before and during the commission of the crime. He then sped away, stopped twice where the shooter got out of the car and he could have pulled off, but he did not. They are tailed by the police car. He does not try and signal for help to report the incident. All of the circumstances show that, in fact, he aided and abetted the defendant during the commission of offense, and he is accountable for his actions. Is there a formal definition of commission that we've ever looked to? I can't recall. Basically, the case law says any act, so certainly the multiple U-turns, the pulling up next to it, the go-ahead gesture. It's a semi-automatic weapon, correct? Correct. So each round had to be individually fired. That is correct. And the vehicle remains stationary during the entire shooting? It does, yes. Apparently, from what I recall of the transcript, the shooting, even though it took, well, there were 11 shell casings found in the vehicle. The magazine apparently had a 13-round capacity. It was empty when the police discovered it, so presumably the gun was emptied at the scene. It did have to be pulled individually at least 11 times, but apparently it was a fairly rapid event. As fast as you can pull your vehicle? Yes. But the vehicle, nonetheless, was stationary for the entire discharge? Correct. And the shots were not just at the driver's window but also shattered the backseat window. There are photos of the Impala in the record, so you can look at that and see the sort of range of shot. And it was a close distance, so there's obvious intent to do more than frighten them. Any other questions? Thank you, Your Honor. Thank you, Counsel. Ms. Wood, rebuttal argument? Thank you. Just to clarify a few points, as Justice Hutchinson pointed out, Eloy's testimony was not just different. It was actually contradicted in several key aspects. He says that Caesar wasn't doing gang signs. Caesar himself admitted he was, and they were sitting right next to each other in the truck, so there's no way that Eloy should not have been able to see that. Clearly, it's reasonable to infer that he was holding back in blaming his best friend at the time for any sort of actual participation in the event. Again, he's the only person to interpret this hand gesture by the defendant as a go-ahead, go-ahead to who knows what, since we have no knowledge of the gun, and that, too, was directly contradicted by Caesar. With respect to the flash and the gang signs, again, he's the only person that said that the defendant said those other guys are flat, they just dipped the crown, and instead, again, contradicted by Caesar, who said, no, it was actually George who said that. The defendant testified there wasn't any gang talk by him. He was just driving his car. He's the only person to say that he and Zachary Reyes arrived at the party. Francisco says, no, I didn't even know the guy. In fact, there's a statement from Zachary that comes in that says he did not know the driver at all. There's no evidence from the phone records that they called each other. In fact, the only contact that's in Francisco's phone was the contact for George. Did your client's vehicle remain stationary during the entire shooting? It did, and, first of all, again, as the state admits, it was a very rapid event. The victims in the car said that at least one of them said that it happened very quickly. The witnesses in the Chevy Tahoe say it happened very quickly. And, in fact, both Francisco and Caesar said initially they thought they were being shot at. So everyone kind of ducked and thought initially that's what was going on. But, again, it happened quickly. Eloy said, go, go, go. What time of the day or night was this? I believe it was towards midnight, but I'm not exactly sure. It's in a closed vehicle. I mean, he reaches out, but the gunshots are right there. The gunshots are right there, yeah. There's testimony by Eloy that says that he's sort of leaning halfway out. But, yeah, they're loud. They're right upon him. And it's at least 11 discharges. Yes, yes. Could this kind of scheme be to confront rival gang members? No, and here's why. Just basic confrontation is not against the law. I will confront my opposing counsel at oral argument. I mean, you can have a confrontation without it turning physical. On arm. I'm sorry? On arm confrontation. Absolutely, absolutely. And even the state's own cases don't support its common design theory because in Phillips, Cooper, and Rico Taylor, in all of those cases, the defendant knew that they were planning a criminal activity. In Phillips, they were going to go do a battery. Phillips cites Tarver, though. Counsel mentioned Tarver during her argument. In Tarver, the group agreed to ride together in a truck to confront the rival group. Now, I realize in that case the people knew that certain people were armed. Yes. But there was an agreement that no one was going to use any weapons and no shots were going to be fired. And the Supreme Court talked about members of a gang being assembled for the purpose of disturbing the peace and doing unlawful acts when they're going to confront a rival gang. You know, if you're going to confront, when he gives the go-ahead sign, is the go-ahead sign to get out of the car and give him a bouquet of flowers? And what's the go-ahead sign for if we're talking about rival gang members and doing two U-turns and pulled up right next to the rival gang member's car? Well, we just simply have no idea. I mean, based from the record, and, again, it's killed beyond a reasonable doubt, we have to have some sort of evidence that, again, Francisco knew that Zachary was armed or that they were going to have a confrontation that would be a criminal activity. There's no plan. And that's not a reasonable inference. No, there's no plan. Everyone was surprised. I mean, if you're in a council having a confrontation in a loral argument, to me there's no reasonable inference that you two are going to engage in fisticuffs or anything like that. But now we're talking about two rival gang members, rival gang groups, at midnight, throwing down gang signs, disrespecting each other, two U-turns to get right next to the car, and then a go-ahead sign. What's the go-ahead sign for to blow them a kiss? I mean, what's the go-ahead sign for? Well, again, this is one person's interpretation that that was even a go-ahead sign. Caesar said he turned the radio down. But, again, that's what the evidence is. And we're not the jury. And we're not supposed to sit up here and say the jury re-weighed the evidence. The jury weighed the evidence. That's not our job. Our job is to look at the evidence and say, is there enough that a rational jury could have found this element proven? Right. And, again, our argument is in the light of so much conflicting evidence or lack of evidence and completely no evidence with respect to knowledge or planning of criminal activity, there's no reasonable inference that can lead to his conviction under accountability. There is no evidence of confrontation. And, again, with the States' cases, we knew what the crime was that they set out to do. And the Illinois Supreme Court, both in Fernandez, actually, and in Perez, say that you have to have an identified crime under common design. And in Perez, they say that even belonging to a gang or gang association, that's not enough. That does not necessarily impute an ill will upon every defendant who associates with a gang. They recognize that gang association can be a geographical necessity. And the gang expert here, in this case, also admitted that as well. With respect to the actual gunshots, I just want to clarify, there's one witness that says, both of the witnesses in the car say that they were following A.C. who was turning right. One of those witnesses said they were turning left, which does not make sense if they were following A.C. who was turning right. The other witness in the car says, no, we were turning right next to the car. Francisco's car was going to turn left in the lane next to him. So there's no, again, Did he go into an opposing lane of traffic, though, when he pulled up next to the impeller? No, there's no evidence that that's the case. The state cites to the shell casings. But, of course, we have the ballistics experts saying that there's no way to tell where the casings would end up, especially with a semi-automatic and rapid fire, as what happened here. And lastly, again, we know that flight is not an element of the offense. We know that he's afraid of Eloy Sandoval, who is the senior gang member in the car, who has self-admitted multiple times, has many, many gang contacts, joint tattoo on his chest. There's every reason to be afraid of him, especially given the fact that he's in a car where a shooting just occurred, that he had no prior knowledge was going to happen. So, again, everything is explained or contradicted in this case. There's a lack of evidence that Francisco had knowledge of the gun. Therefore, it could not be a shared intent case. There's lack of evidence that there was any common design to commit a criminal activity such that it led to the shooting. And so, again, we would ask this court to reverse his conviction. Thank you. The court would thank the attorneys for their argument today, and we'll take a short recess. The case will be taken under advisory.